United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CLAUDE L. MITCHELL,

Petitioner,

v.

SUZANNE M. PEERY, Warden,

Respondent.

Case No. 15-cv-05749-HSG (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY**

Before the Court is the above-titled petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254 by petitioner Claude L. Mitchell, challenging the validity of a judgment obtained against him in state court. Respondent filed an answer to the petition. Petitioner has filed a traverse. For the reasons set forth below, the petition is denied.[1]

## I. PROCEDURAL HISTORY

On April 2, 2012, a Contra Costa County jury found petitioner guilty of first degree murder with personal use of a firearm. CT 375-80.[2] On June 1, 2012, the trial court sentenced petitioner to 50 years to life in state prison. RT 1008-09.

On January 29, 2015, the California Court of Appeal affirmed the judgment in an unpublished decision. Ex. 6. On April 15, 2015, the California Supreme Court denied review.

[1] Petitioner named W. Gower, former warden of the California Correctional Center ("CCC")—where petitioner is incarcerated—as the respondent in this action. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Suzanne M. Peery, the current warden of CCC, is hereby SUBSTITUTED as respondent in place of petitioner's prior custodian.

[2] All references herein to exhibits are to the exhibits submitted by respondent in support of the answer, unless otherwise indicated. References to "CT" and "RT" are to the Clerk's Transcript and Reporter's Transcript of the state proceedings.

Ex. 8. Petitioner did not pursue state collateral review. The instant petition was filed on December 15, 2015.

## II. STATEMENT OF FACTS

The following background facts describing the crime and trial proceedings are from the January 29, 2015 opinion of the California Court of Appeal[3]:

> In April 2010, defendant and his girlfriend, April McGlothin, were living with April's mother Letris Ross (Letris) and her husband Carlton Ross (Ross). Defendant and McGlothin had an eighteen-month-old son and McGlothin was nine months pregnant.
>
> Letris testified Ross was upset with defendant and McGlothin because they had not provided their share of the rent money. Ross was complaining about the rent in an angry, loud voice for more than an hour causing Letris and McGlothin to cry. The sight of the women crying caused defendant to begin arguing with Ross, but the argument with defendant lasted only a few minutes. Ross asked defendant and McGlothin to leave the apartment. Defendant said that he was not going to leave and he had "30 days." Ross approached defendant as if to forcibly remove him from the apartment, but Letris instructed him not to touch defendant and he did not. Letris told McGlothin and [defendant] to go. As defendant and McGlothin left, Ross followed them outside and the men yelled obscenities at each other. Letris testified that she was inside the apartment and heard a gunshot and Ross said "Oh, shit." She saw Ross stumbling up the stairs holding onto his abdomen. She ran to grab a towel and call 9-1-1. She testified that as she was dialing, she saw defendant at the bottom of stairwell with the gun pointed at Ross. She saw defendant shoot Ross. She told police that defendant called Ross a "bitch ass motherfucker" and she heard "pow, pow, pow." There was some dispute about whether Letris got the towel and called 9-1-1 between the first shot and the later shots or after all the gunshots. Letris said that she heard a total of four or five shots. She testified that defendant was approximately seven to eight feet from Ross.
>
> McGlothin testified about the argument in the apartment and that she and her mother were crying. She said she wanted defendant to leave the apartment and told him "Let's just go." She testified that as she and defendant walked down the stairs, defendant yelled "fuck you" to Ross who was on the top of the landing. Ross then yelled in response and started to come down the stairs. She initially walked down the stairs and defendant and Ross were behind her arguing but she then got between them and tried to push defendant down the stairs away from Ross. McGlothin began walking away, toward her sister's apartment, when she heard a popping noise. At trial, she testified that she turned and saw Ross grab his stomach, although she had earlier told an interviewing officer that she had not turned around when she heard the gunshot. She saw blood and passed out. When she awoke, she ran toward her sister's apartment.

---

[3] This summary is presumed correct. *Hernandez v. Small*, 282 F.3d 1132, 1135 n.1 (9th Cir. 2002); 28 U.S.C. § 2254(e)(1).

Later, she came back toward the Ross apartment because her infant son was still there. She saw her mother with Ross, who was not moving, and saw that defendant had taken her car.

Brandon Abon, who was twelve years old at the time of the shooting, was playing basketball near the apartment carport. He testified that he saw defendant and Ross arguing on the stairs. He saw defendant start to walk away and then pull a gun from his waistband, point it at Ross, and start to shoot. Abon said the two men were about six feet apart. He heard shots and saw Ross fall by the staircase.

Caleb Quezada, who was 11 years old at the time of shooting, was playing basketball with Abon. He heard people yelling: one person said "I'll be back" and the other said "No, you won't." He saw an older black man, a younger black man and a black woman. He saw defendant reach for his gun and point it at Ross. The two men were five or six feet apart. He heard five or six shots.

Defendant testified that he and Ross argued in the apartment and that Ross hit him when they were leaving the apartment. He stated that Ross followed him down the stairs and grabbed him by his hood and was yelling that he would kill him. Defendant testified that he reached for his gun, closed his eyes and squeezed the trigger. He stated that he was afraid, Ross was pursuing him, and he could not get away. He testified that when Ross grabbed his collar, he tried to push away. He told police they were "nose to nose" but then on cross-examination said that they could not have been nose to nose because Ross was "quite taller than me." He testified that Ross was still holding him when he pulled the gun out. He stated that he fell on his back at the bottom of the stairs. Defendant had told police that when he shot Ross, Ross fell on top of him and he had to push Ross off his body, leaving blood on his clothes. On cross-examination, he testified that this statement was a "mistake." He told police that Ross was facing him during the shooting, and could not explain how he shot Ross in the back. Defendant testified that he used his gun because the "fear was building" and he felt he could not get away.

A crime scene investigator from the Concord Police Department, Nicole Mendenhall, took the photographs of the crime scene. She described the victim, Ross, as lying on his back with his head on the eighth stair and his body on the stairs below. She examined the shell casings to determine the location of the suspect in relation to the victim and the trajectory of the bullets.

The forensic pathologist, Ikechi Ogan, testified that there was "no evidence of close-range firing" on the skin around the wound to Ross's abdomen. There was no gunpowder or soot. Ogan testified that the gunshot wound to the abdomen could have been "survivable." For the second gunshot wound to the torso and the three gunshot wounds to the victim's head, there was similarly "no evidence of close-range firing." Ogan testified that at the time of the injury, Ross's head was very close to the wall based upon the high velocity blood spatter. The victim was "at a higher level than the assailant at the time the bullets were fired."

Deputy Sheriff Criminalist Donald Finley testified that he examined Ross's tee shirt after the homicide for gunshot residue. Based upon his examination of the gunshot hole in the front of Ross's tee shirt, he estimated the gun was fired from a distance of greater

than six feet away from Ross. Based on the gunshot and particulates on the gunshot hole in the back of the shirt, he estimated that Ross was shot from several feet away. He defined several feet as anywhere from two and one-half feet to six feet away. Finley testified that based upon the blood spatter, Ross's head was near the position where his body was found, lying on his back on the stairs. He testified that Ross could not have been standing up at the time he was shot in the head.

*Hearings Regarding Defendant's Childhood Abuse*

The court held a hearing after opening statements regarding defense counsel's attempt to address her client's background and childhood. During opening statements, counsel attempted to discuss defendant's childhood and the prosecutor objected. Defense counsel argued it was relevant to her client's state of mind at the time of the shooting. Defense counsel asserted that defendant could present an imperfect self-defense theory based upon his past experiences. The court inquired what those specific experiences were and defense counsel stated that she did not "have exact details" but she only wanted to introduce the idea in the opening statement. The prosecution argued that evidence of defendant's childhood was calculated to influence "the passions and prejudices and sympathies of the jury." Without expert testimony, counsel would be asking the jury to speculate about how these childhood experiences played a role in his unreasonable belief he needed to act in self-defense.

The court recounted what occurred in the meeting in chambers to address the issue. The court stated that defense counsel had mentioned that at the age of three years old, defendant was taken from his mother and put into foster care. The court inquired what the relevance of defendant's "bad childhood" would be to his defense. Defense counsel explained that it went to the issue of imperfect self-defense. The court inquired if defense counsel would be presenting an expert and counsel stated she would not. The court stated: "I didn't find it to be relevant. There was no particular theory that these things psychologically, you know, with studies done and so forth, would have affected his behavior, and without that expert testimony to link it up, I thought it was a plea towards sympathy to the defendant because of a bad upbringing as opposed to why he acted the way he did on this occasion."

Defense counsel raised the issue again prior to defendant's testimony at trial and the court held a hearing. Defense counsel asserted that defendant planned to testify about his childhood abuse as it related to the issue of imperfect self-defense. Defendant was in foster homes from ages three through fifteen years old where he was severely beaten. Defendant argued that this made him perceive Ross's actions as a threat. The prosecution argued that without expert testimony, it was conjecture and irrelevant and would appeal to the passions and prejudices of the jury. The prosecution also asserted that it would open the door to the introduction of defendant's past violent behavior.

The court set forth the legal standard for imperfect self-defense and found that defendant's beatings as a child in foster care were not connected to any of the elements of imperfect self-defense, "especially without the testimony of an expert." "[W]ithout somebody to give us some professional connection as opposed to just defendant getting up and getting in his character of a bad childhood is just too thin and too vague . . . . [W]ithout a doctor to say because of these beatings he has suffered this particular

trauma, that trauma is diagnosed as such, and this diagnosis leads people to act ... [or] perceive things much differently" the evidence is not admissible. The court found that defendant had made an insufficient showing to introduce the evidence.

*Closing Argument*

In closing argument, the prosecution discussed the elements of self-defense. She presented a hypothetical where she described a person breaking into "your house" and pointing a gun at you and telling you that he will kill you. The prosecutor stated that if you shoot first, you have acted in lawful self-defense. "[T]his is applying our community standard. Anybody in that situation would have reasonably believed that they were in imminent danger of being killed or suffering great bodily injury if they did not respond right at that moment with lethal force."

The prosecutor explained heat of passion: "Heat of passion reduces murder to the lesser crime of manslaughter if the evidence shows that there was a sudden quarrel or heat of passion. It does that by wiping out that element of malice that we talked about. It has to completely wipe that out." The prosecutor asserted that the evidence must show that the killer's judgment gave way to passion "so that he was acting from the passion rather than from judgment. Not emotion. Emotion isn't the same thing because I would submit to you that 99 percent of murders happened due to emotion, anger, jealousy . . . ." The evidence must show that the killer is no longer capable of exercising judgment and that his emotional response "short-circuited the reasoning part of his brain."

"Murder only gets reduced to manslaughter in situations where we, as a community, say this particular killing occurred in such an overwhelming situation that we could understand why any one of us might have acted the same way."

In discussing imperfect self-defense the prosecutor stated it does not apply here "because under all the evidence of this case there is no way for us to believe that the defendant actually believed himself that he needed to use deadly force here." For imperfect self-defense a defendant must "actually but unreasonably believe[ ] he was in imminent danger of being killed" and that he must use lethal force. The prosecutor argued that defendant was not in imminent danger. Ross was unarmed and several feet away from defendant. There is no evidence that after the first shot, defendant needed to advance on Ross and fire additional shots.

In her closing argument, defense counsel explained "imperfect self-defense is not reasonable. It's not a community standard, as [the prosecutor] talked about in other instances. It's whether he believed it, and you can think that that was totally wrong on his part." She explained heat of passion as "any violent or intense emotion that causes a person to act without due deliberation and reflection." Heat of passion does not require anger, rage or any specific emotion.

The court instructed the jury on the elements of both self-defense and imperfect self-defense. The court explained that provocation can reduce first degree murder to second degree murder or murder to manslaughter. A killing that would otherwise be murder is reduced to manslaughter if it was because of a sudden quarrel or in the heat of passion. "Heat of passion does not require anger, rage, or any specific emotion. It can be any

> violent or intense emotion that causes a person to act without due deliberation and reflection"
>
> Defendant was convicted of first degree murder and the jury found true an enhancement for gun use. Defendant was sentenced to an indeterminate term of 50 years to life.

*People v. Mitchell*, No. A135965, 2015 WL 393543, at *1-4 (Cal. Ct. App. Jan. 29, 2015) (footnote omitted).

**III. DISCUSSION**

**A. Standard of Review**

A petition for a writ of habeas corpus is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state courts adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). Additionally, habeas relief is warranted only if the constitutional error at issue "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Penry v. Johnson*, 532 U.S. 782, 795 (2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." *Williams*, 529 U.S. at 405-06. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's

decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411.

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence. "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412. "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003).

The state court decision to which Section 2254(d) applies is the "last reasoned decision" of the state court. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Barker v. Fleming*, 423 F.3d 1085, 1091-92 (9th Cir. 2005). Here, the California Supreme Court denied review. Thus, the last reasoned state court decision is that of the court of appeal.

**B. Claims**

Petitioner asserts the following grounds for relief: (1) the trial court erred in excluding evidence of his childhood abuse; (2) the prosecutor committed misconduct during closing argument; and (3) the cumulative effect of the above errors rendered his trial fundamentally unfair. The Court addresses these claims in turn.

**1. Exclusion of Evidence**

Petitioner claims the exclusion of evidence of his bad childhood violated his right to due process and his right to present a defense. Petition at 5. The court of appeal rejected this claim as follows:

> Defendant contends that by excluding testimony about his childhood abuse, the trial court improperly precluded him from presenting the evidence necessary to demonstrate imperfect self-defense. Defendant's argument fails for two reasons. First, he was not precluded from presenting his defense at trial and did, in fact, testify to facts supporting imperfect self-defense. Second, it was defendant's failure to present expert testimony linking his childhood experiences to his state of mind at the time of the crime that

United States District Court
Northern District of California

necessitated the court's ruling precluding the evidence.

*Standard of Review*

A trial court's decision to exclude evidence is reviewable for abuse of discretion. (*People v. Vieira* (2005) 35 Cal.4th 264, 292.)

The " '[a]pplication of the ordinary rules of evidence ... does not impermissibly infringe on a defendant's right to present a defense.' " (*People v. Fudge* (1994) 7 Cal.4th 1075, 1102-1103.) "A defendant's rights to due process and to present a defense do not include a right to present to the jury a speculative, factually unfounded inference." (*People v. Mincey* (1992) 2 Cal.4th 408, 442.) "Evidence Code section 352 must yield to a defendant's due process right to a fair trial and to the right to present all relevant evidence of significant probative value to his or her defense." (*People v. Cunningham* (2001) 25 Cal.4th 926, 998-999 citing *People v. Babbitt* (1988) 45 Cal.3d 660, 684.)

*Analysis*

"Two factors may preclude the formation of malice and reduce murder to voluntary manslaughter: heat of passion and unreasonable self-defense." (*People v. Elmore* (2014) 59 Cal.4th 121, 133.) " '[O]ne who holds an honest but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury does not harbor malice and commits no greater offense than manslaughter.' " (*Id.* at p. 134, quoting *People v. Flannel* (1979) 25 Cal.3d 668, 672.) Unreasonable self-defense is based on a defendant's assertion that he lacked malice and acted on the belief that he needed to defend himself. (*Id.* at p. 136.) A defendant must unreasonably believe that "deadly force is necessary in self-defense." (*People v. Manriquez* (2005) 37 Cal.4th 547, 583.)

Defendant's testimony at trial sought to establish imperfect self-defense and this is what his counsel argued to the jury. Defendant testified that after the argument in the apartment, Ross followed him down the stairs and grabbed him by his hood and was yelling that he would kill him. He stated that he was afraid, Ross was pursuing him, and he felt he could not get away. Defendant stated that he used his gun because the "fear was building" and he felt he could not escape.

In closing argument, defense counsel discussed self-defense, imperfect self-defense and heat of passion. She argued if defendant "believed that he was in danger and that he needed to shoot, to use a gun, even though you think that's ridiculous, that still makes it a voluntary manslaughter." She told the jury to focus on what was going on in defendant's mind and why he thought he needed to use force. She highlighted that Ross went toward defendant in the apartment and Letris told him not to touch him. Defense counsel argued that Ross was acting in a menacing, aggressive manner. She argued that Ross was a large man, six foot, two inches and 233 pounds and he was coming down the stairs at defendant. The incident "happened very fast. It was a fight. It was an argument. It was a man who was on a rampage, who was yelling and screaming and chasing [defendant] down the stairs, causing women to cry, a child to cry. This was not calm. This was something highly emotional."

Defendant argues on appeal that because of his experiences being abused as a child, he had

a greater sense of fear and a need to protect himself. "It would make him believe, sooner than most people, in the need to defend and use deadly force."

Defendant argues that the effects of childhood abuse on a person's behavior as an adult is within the jury's common experience and does not require expert testimony citing *People v. McDowell* (2012) 54 Cal.4th 395. In *McDowell*, the trial court excluded the defense expert's testimony about how defendant's childhood could have affected his adult behavior. McDowell grew up in a violent household where his father beat him, his siblings, and his mother. (*Id.* at p. 408.) The court held there was no abuse of discretion in excluding the testimony because "the jury did not need the opinion expressed by [the expert] in her proposed testimony to assist it in ascertaining whether defendant's childhood could have affected his behavior as an adult." (*Id.* at p. 423.) The expert's testimony would not address the ultimate issue of defendant's mental state at the time of the commission of the offense, but only how the abuse affected the development of McDowell's character. (*Id.* at p. 424.) The expert was not a mental health professional and could not render an opinion on defendant's mental state, but rather she would state that a bad childhood can affect a person as an adult. (*Id.* at p. 425.) The Supreme Court concluded that because the expert's testimony was that "defendant's childhood could have affected defendant's behavior as an adult, not how defendant's specific childhood experiences influenced the crimes he committed as an adult," the opinion was neither complex nor technical and addressed a matter readily understood by the jury. (*Id.* at p. 427; *People v. Czahara* (1988) 203 Cal.App.3d 1468, 1478 [affirming trial court's exclusion of expert testimony about whether provocation was sufficient to cause a reasonable person to respond violently: "the adequacy of provocation is not a subject sufficiently beyond common experience that the opinion of an expert would assist the trier of fact"].)

In the present case, the type of testimony the trial court was seeking was precisely the kind not present in *McDowell*: how defendant's specific childhood experiences influenced the commission of the crime. The jury could readily understand that defendant's abusive childhood impacted his behavior as an adult, but expert testimony was necessary to explain how his childhood experiences impacted his mental state at the time of the offense and why this supported a theory of imperfect self-defense. Expert testimony was needed on the issue of defendant's mental state at the time of the shooting to make the childhood abuse testimony relevant at trial.

*People v. Wright* provides an example of the way expert testimony should be used to bolster a claim of imperfect self-defense. (*People v. Wright* (2005) 35 Cal.4th 964.) The defense called a psychiatrist to testify concerning defendant's mental state that at the time he shot the victim he was suffering from an "amphetamine induced psychotic disorder, with delusions." (*Id.* at p. 970.) The expert opined "in support of defendant's claim of imperfect self-defense, that a person suffering from defendant's symptoms would have a heightened sensitivity to threat, especially when crowded by other people." (*Ibid.*) This is precisely the testimony that is missing from the present case. Defendant failed to present an expert who could testify about defendant's mental state at the time of the shooting based upon his history of childhood abuse. (See *People v. Smith* (2005) 35 Cal.4th 334, 363 [expert testimony was proper because the experiences of child victims of violent sexual assault are sufficiently beyond common experience: "Only a fraction of the general population, and presumably none of the jurors, has been personally victimized. Of course

> a juror can try to imagine what it would be like for a child to experience such an assault, but this kind of imagining does not substitute for expert testimony"].)
>
> This case is more analogous to *People v. Thornton*. In *Thornton* defendant sought to introduce evidence that his stepfather beat his mother. (*People v. Thornton* (2007) 41 Cal.4th 391.) The court allowed evidence of three instances where defendant was present but would not allow instances when defendant did not witness the abuse. (*Id.* at pp. 447-448.) Defense counsel argued that, in her opinion, spousal abuse affects children whether or not they witness it. The Supreme Court upheld the exclusion of the evidence on relevance grounds because defendant presented no authority to support his position. Defense counsel simply provided her opinion that living in a household in which abuse occurred affected defendant even if he did not observe it, and even if he was not in the house at the time. (*Id.* at p. 448.) "Counsel made no offer of proof, did not attempt to lay any factual foundation for the view she expressed, and was not speaking on a subject on which judicial notice could be taken. This was insufficient to establish the relevance of the evidence." The court held that "[t]he trial court was not required to accept counsel's mere speculation about the psychological consequences of spousal violence in ruling on the proffered evidence's relevance." (*Ibid.*)
>
> Similarly, the trial court here was not required to accept defense counsel's argument about the psychological consequences of defendant's childhood abuse. Counsel made no offer of proof and provided no basis for the court to conclude that the evidence was relevant. (See *People v. Romero* (1999) 69 Cal.App.4th 846, 856 ["Further, no sociological expert could have provided this missing mental state of defendant's actual subjective state of mind at the time he stabbed [the victim]. . . . Absent evidence that defendant was in fear of imminent death or great bodily injury, the jury had no evidentiary basis from which to conclude that defendant subjectively had an actual but unreasonable fear which negated malice aforethought"].)

*People v. Mitchell*, 2015 WL 393543, at *4-6.

A state court's evidentiary ruling is not subject to federal habeas review unless the ruling violates federal law, either by infringing upon a specific federal constitutional or statutory provision or by depriving the defendant of the fair trial guaranteed by due process. *Pulley v. Harris*, 465 U.S. 37, 41 (1984); *Jammal v. Van de Kamp*, 926 F.2d 918, 919-20 (9th Cir. 1991). Failure to comply with state rules of evidence is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds. *Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999); *Jammal*, 926 F.2d at 919. While adherence to state evidentiary rules suggests that the trial was conducted in a procedurally fair manner, it is certainly possible to have a fair trial even when state standards are violated. *Perry v. Rushen*, 713 F.2d 1447, 1453 (9th Cir. 1983).

"[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." *Holmes v. South Carolina*, 547 U.S. 319, 324

(2006) (alteration in original) (quoting United *States v. Scheffer*, 523 U.S. 303, 308 (1998)); *see also Montana v. Egelhoff*, 518 U.S. 37, 42 (1996) (due process does not guarantee a defendant the right to present all relevant evidence). "[T]he introduction of relevant evidence can be limited by the State for a valid reason." *Montana*, 518 U.S. at 53 (internal quotation marks omitted). But this latitude is limited by a defendant's constitutional rights to due process and to present a defense, rights originating in the Sixth and Fourteenth amendments. *Holmes*, 547 U.S. at 324. Due process is violated only where the excluded evidence had "persuasive assurances of trustworthiness" and was critical to the defense. *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973). "Only rarely [has the Supreme Court] held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence." *Nevada v. Jackson*, 133 S. Ct. 1990, 1992 (2013).

Applying these legal principles to petitioner's current allegations, the state court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent. Petitioner has not shown that the trial court's refusal to admit the excluded evidence denied him the fundamental right to present a defense.

Further, the court of appeal found that, even assuming error, the exclusion of evidence was harmless under state law. *See People v. Mitchell*, 2015 WL 393543, at *7-8. Here, assuming arguendo that the exclusion of evidence was improper, this Court, for reasons similar to those expressed by the court of appeal, agrees any error was harmless. Specifically, petitioner's testimony described the ways in which he believed Ross was acting inappropriately towards Letris and McGlothin, how Ross verbally and physically attacked him when he came to the defense of the women, how Ross pursued and attacked him repeatedly when he tried to escape, and how petitioner pulled his gun from his waistband in confusion over why Ross was continuing to attack him. RT 1093-97, 1104-15. He called several additional witnesses either to impeach the testimony of others or to support his claims. *See* RT 741-953. Thus, he was not precluded from presenting his self-defense claim.

Petitioner's testimony, however, was internally inconsistent, inconsistent with the testimony of every percipient witness, and inconsistent with the physical evidence. Both

McGlothin and Letris were consistent in their testimony that Ross did not threaten petitioner with physical harm and did not touch him. RT 260-74, 564-69, 576-86. Petitioner's testimony, that as they descended the stairs Ross threatened to kill him while physically assaulting him, was contradicted by the testimony of the boys playing basketball near the carport. Specifically, contrary to petitioner's testimony that McGlothin preceded him down the stairs, which allowed Ross to grab petitioner, Brandon Abon testified that he observed a woman trying to push a younger man (petitioner) away from an older man (Ross). He saw petitioner start to walk away, then pull a gun from his waistband, turn, point the weapon and shoot Ross at least five times from a distance of about six feet. RT 204-05. Caleb Quezada heard petitioner say, "I'll be back," followed by Ross saying, "No, you won't." He then saw petitioner, who was standing by the parking lot and about five to six feet from Ross, shoot him five or six times. RT 233-36, 249.

Petitioner's testimony of a close contact battle in which he shot Ross as he struggled to break away was also inconsistent with the physical evidence. There was no gunpowder stippling or soot on Ross's shirt or near his wounds indicative of a close-range shooting. RT 452, 494, 503-07, 776-80. Letris testified that after she heard a shot and saw Ross holding his abdomen, Ross fell back as he tried to get back up the stairs, at which point petitioner shot him four or five more times. RT 263, 266-70. The blood spatter evidence supported Letris's testimony. There was high velocity blood spatter in the area where Ross's head came to rest below the level of the handrail. This meant that Ross's head was below the handrail and close to the wall when petitioner continued to shoot. RT 520; 789-96.

At one point during trial, petitioner testified that once he pulled his gun, he had to shoot Ross rather than warn him to back away because a warning "doesn't work in a real situation." RT 1194-95. On the other hand he testified that the shooting was an accident. He had no recollection of pulling the trigger. The gun just went off when petitioner closed his eyes. He did not aim at Ross, and with his eyes closed during the shooting he could not explain how Ross happened to be shot in the back and three times in the head. RT 1113, 1179, 1183.

In sum, given the weaknesses in petitioner's self-defense claim, petitioner fails to demonstrate that additional testimony about his being in foster care as a child—particularly

without an expert to explain the relevance of the testimony—would have influenced the jury's verdict. *See Brecht*, 507 U.S. at 637.

Accordingly, petitioner is not entitled to habeas relief on this claim.

**2. Prosecutorial Misconduct**

Petitioner claims the prosecutor committed misconduct during closing argument by misrepresenting the law on provocation. Petition at 5. The court of appeal first found that petitioner had forfeited the claim by failing to object at trial:

> Defendant did not object to the prosecutor's allegedly improper statements at the time. "In order to preserve an appellate claim of prosecutorial misconduct, a defendant must make a timely objection at trial and request an admonition; otherwise, a claim is reviewable only if an admonition would not have cured the harm caused by the misconduct." (*People v. Wilson*, *supra*, 36 Cal.4th at p. 337 citing *People v. Farnam* (2002) 28 Cal.4th 107, 167.) Absent evidence that an admonition would not have cured the perceived harm, defendant forfeits his claim of prosecutor misconduct. (*People v. Wilson, supra*, at p. 337.)

*People v. Mitchell*, 2015 WL 393543, at *8.

The court of appeal went on to find that even if the claim had not been forfeited, it would fail on the merits:

> *Analysis*
>
> Defendant's first objection is to the prosecutor's statement in closing argument about malice. The prosecutor stated: "Heat of passion reduces murder to the lesser crime of manslaughter if the evidence shows that there was a sudden quarrel or heat of passion. It does that by wiping out that element of malice we talked about. It has to completely wipe that out." Defendant argues that the law does not require provocation to "wipe out" malice and that this statement improperly shifted the burden of proof to the defense.
>
> The prosecutor's statement that heat of passion "wipes out" malice is an imprecise but not incorrect characterization of the law. (See *People v. Breverman* (1998) 19 Cal.4th 142, 154 [heat of passion and unreasonable self-defense reduce murder to voluntary manslaughter by "*negating the element of malice*"]; *People v. Speight* (2014) 227 Cal.App.4th 1229, 1241 ["heat of passion is a mental state that precludes the formation of malice and reduces an unlawful killing from murder to manslaughter"]; *People v. Gutierrez* (2003) 112 Cal.App.4th 704, 708 ["the requisite mental element of malice is negated by a sudden quarrel or heat of passion, or by an unreasonable but good faith belief in the necessity of self-defense"]; *People v. Rios* (2000) 23 Cal.4th 450, 461 [imperfect self-defense "obviates malice because that most culpable of mental states 'cannot coexist' with an actual belief that the lethal act was necessary to avoid one's own death or serious injury at the victim's hand"].)
>
> Defendant is correct that the prosecution bears the burden of proving malice. In cases

involving voluntary manslaughter, "the People may have to prove the absence of provocation, or of any belief in the need for self-defense, in order to *establish the malice element of murder*." (*People v. Rios*, *supra*, 23 Cal.4th at p. 454.) "When malice is an element of murder and heat of passion or sudden provocation is put in issue, the federal due process clause requires the prosecution to prove its absence beyond a reasonable doubt." (*People v. Thomas* (2013) 218 Cal.App.4th 630, 643 citing *Mullaney v. Wilbur* (1975) 421 U.S. 684, 704.)

The prosecutor's statement that heat of passion must wipe out malice does not shift the burden of proof to defendant. "Ordinarily, it is the defendant who offers evidence to show that because the killing occurred in a sudden quarrel or heat of passion, or in unreasonable self-defense, the crime committed is not murder, but only voluntary manslaughter." (*People v. Barton* (1995) 12 Cal.4th 186, 199.) The prosecutor explained that to find heat of passion the evidence must show that defendant was acting from passion, not judgment. The prosecutor's statements did not relieve her of the burden of proving murder, it simply identified that heat of passion must negate malice. As explained below, if this created any confusion for the jurors, the court correctly instructed the jury on voluntary manslaughter and the burden of proof.

Defendant's second argument is that the prosecutor improperly told the jury that provocation cannot be based on emotion. The prosecutor asserted that the evidence must show that the killer's judgment gave way to passion "so that he was acting from the passion rather than from judgment. Not emotion. Emotion isn't the same thing because I would submit to you that 99 percent of murders happened due to emotion, anger, jealousy . . . ."

Defendant is correct that the prosecutor's statement could have been confusing to the jury. The state argues on appeal that the "gist" of the prosecutor's argument was not that the jury could not base its finding of provocation on emotion bur rather "the prosecutor argued that emotion alone was not enough." The state contends that no one would be convicted of murder if all that was required was an event that caused a defendant to feel regular emotion. The prosecutor does clarify this initial statement in subsequent statements, telling the jury: "Anger's just motive. Injured pride? Just motive. Not a defense or justification. [¶] What the evidence has to show you is that the killer was no longer capable of experiencing judgment there was some emotional response to the situation that was so overwhelming that it short-circuited the reasoning part of his brain." Later in the argument, she states correctly that the "provocation has to cause the defendant to act rashly and under the influence of intense emotion that obscured his judgment and his reasoning."

As defendant correctly points out provocation can be based upon " ' " 'violent, intense, high-wrought or enthusiastic emotion.' " ' " (See *People v. Breverman, supra,* 19 Cal.4th at p. 163.) But this emotion must rise to the level of passion that obscures judgment. "Heat of passion arises if, ' "at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment." ' " (*People v. Beltran* (2013) 56 Cal.4th 935, 942 citing *People v. Barton, supra,* 12 Cal.4th at p. 201.) Taken in context of the closing argument as a whole and in light of the court's instructions to the jury, the prosecutor's statement was not reversible error.

United States District Court
Northern District of California

Defendant's third argument is that the prosecutor incorrectly told the jury that provocation must have made defendant so impaired that he "couldn't think anymore." Specifically, the prosecutor stated in closing argument: "What the evidence has to show you is that the killer was no longer capable of experiencing judgment because there was some emotional response to a situation that was so overwhelming that it short-circuited the reasoning part of his brain. He had to be so impaired by this provoking event that he simply couldn't think anymore."

It is a correct statement of the law that for heat of passion to apply, " ' "the reason of the accused was obscured or disturbed by passion." ' " (*People v. Beltran, supra,* 56 Cal.4th at p. 942.) A defendant's "reaction bypassed his thought process to such an extent that judgment could not and did not intervene." (*Id.* at p. 949.) The prosecutor's statement that defendant must be so impaired that he could not think anymore is akin to the language in *People v. Beltran* that a defendant's reaction bypassed his thought process or his reason was obscured by passion.

Defendant's final argument is that the prosecutor improperly argued that provocation must be viewed by a reasonableness or community standard. The prosecutor stated: "Murder only gets reduced to manslaughter in situations where we, as a community, say this particular killing occurred in such an overwhelming situation that we could understand why any one of us might have acted in the same way." Defendant contends this erroneous statement was compounded by an improper hypothetical. The prosecutor stated that if a father were to see his son in a dark alleyway being sexually assaulted and in a "complete blind rage, he attacks the man who's hurting his child. And if that man is killed, we would be talking about the heat of passion . . . ." She explained that "when we apply the community standard for heat of passion, any other reasonable father or parent or person would have responded in the same way to seeing such a provoking event, such an emotional, overwhelming event. That's heat of passion."

The standard for provocation is based on the reaction of an ordinary person. "To be adequate, the provocation must be one that would cause an emotion so intense that an ordinary person would simply react, without reflection." (*People v. Beltran, supra,* 56 Cal.4th at p. 949.) "In other words, provocation is sufficient not because it affects the quality of one's thought processes, but because it eclipses reflection. A person in this state simply reacts from emotion due to the provocation, without deliberation or judgment. If an ordinary person of average disposition, under the same circumstances, would also react in this manner, the provocation is adequate. . . ." (*Id.* at p. 950; *People v. Moye* (2009) 47 Cal.4th 537, 550 ["the provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection"].)

"[N]o defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless further the jury believe that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable man." (*People v. Beltran, supra,* 56 Cal.4th at p. 950 citing *People v. Logan* (1917) 175 Cal. 45, 49.) In evaluating provocation, "it is a question of fact for the jury whether the circumstances were sufficient to arouse the passions of the ordinarily reasonable person." (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1140 quoting *People v. Fenenbock*

(1996) 46 Cal.App.4th 1688, 1705.)

The state concedes in its brief that the example provided by the prosecutor was more properly characterized as justifiable homicide, not voluntary manslaughter, and a similar argument was disapproved of in *People v. Najera* (2006) 138 Cal.App.4th 212. In *Najera*, the prosecutor described a situation where you find someone in your home, molesting your child and "pull out your gun and shoot that person who's molesting your child." (*Id.* at p. 221.) The prosecutor described this as heat of passion because "you're so inflamed, as a reasonable person would be in that situation, that you killed this person that's molesting your child." (*Id.* at p. 222.) The court held that the prosecutor's example overstated the level of provocation needed for heat of passion. (*Ibid.*)

Here, the prosecutor's characterization of the objective standard of an ordinary, reasonable person as "any one of us" is not misconduct. It is, again, perhaps not the clearest way to frame the standard but it should not have been misleading to the jury given the context of the argument and the court's instructions.

The prosecutor's statement that the jurors must consider if any one of us might have "acted the same way" is not a proper statement of the law. Recently, the Supreme Court clarified in *People v. Beltran* that the correct analysis is not whether an ordinary person would have "acted the same way" but whether he or she would have reacted in the same way. "[P]rovocation is not evaluated by whether the average person would act in a certain way: to kill. Instead, the question is whether the average person would react in a certain way: with his reason and judgment obscured." (*People v. Beltran, supra,* 56 Cal.4th at p. 949.)

The jurors could properly consider whether the events in this case would have caused them, as ordinary reasonable people, to react with passion rather than judgment. The prosecutor's statement preceded a discussion of provocation and the explanation that the defendant cannot "set [up his] own standard [of conduct]." The court instructed the jury pursuant to CALCRIM No. 570 that "[i]n deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment."

Like the prosecutor in *Najera*, the prosecutor here "interspersed correct statements of the law with the incorrect ones ...." and this may have caused confusion but this was remedied by the jury instructions. (*People v. Najera*, *supra*, 138 Cal.App.4th at p. 224.) Some of the prosecutor's characterizations of the effects of provocation on defendant's mental state may have been confusing but taken in the context of her full argument, they did not deprive defendant of a fair trial. (See *People v. Friend*, *supra*, 47 Cal.4th at p. 30 ["we conclude that none of the asserted instances of misconduct was of such severity, considered alone or together with the other asserted instances of misconduct, that it resulted in an unfair trial in violation of defendant's state and federal constitutional rights"].)

*The Jury Was Properly Instructed*

Any concern that the jury might have misinterpreted the prosecutor's comments during closing argument was eliminated by the jury instructions the court gave in this case. We presume that the jury followed those instructions. (*People v. Boyette* (2002) 29 Cal.4th

> 381, 436.) We also presume that the " 'the jury treated the court's instructions as statements of law, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade.' " (*People v. Seaton* (2001) 26 Cal.4th 598, 646.) The jury was instructed pursuant to CALCRIM Nos. 522 and 570 which properly set forth the tests for determining provocation and voluntary manslaughter.
>
> The jury was also instructed pursuant to CALCRIM No. 222: "Nothing that the attorneys say is evidence. In their opening statements and closing arguments the attorneys discuss the case, but their remarks are not evidence."
>
> Where, as here, the jury was carefully instructed on the elements of provocation, the burden of proof and what constitutes evidence, we find no reversible error. (See *People v. Najera*, *supra*, 138 Cal.App.4th at p. 224 [affirming conviction even though prosecution incorrectly characterized provocation in closing argument where the trial court correctly instructed the jury and defendant could not show prejudice].)

*People v. Mitchell*, 2015 WL 393543, at *8-12 (footnote omitted).

Prosecutorial misconduct is cognizable in federal habeas corpus; "the appropriate standard of review for such a claim . . . is the narrow one of due process, and not the broad exercise of supervisory power." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (internal quotation marks omitted). A defendant's due process rights are violated when a prosecutor's misconduct renders a trial fundamentally unfair. *Id.*; *Smith v. Phillips*, 455 U.S. 209, 219 (1982) (noting that "the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor"). Under *Darden*, the first issue is whether the prosecutor's remarks were improper; if so, the next question is whether such conduct "infected the trial with unfairness." *Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir. 2005). A prosecutorial misconduct claim is decided by "examining the entire proceedings to determine whether the prosecutor's remarks so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Johnson v. Sublett*, 63 F.3d 926, 929 (9th Cir. 1995) (internal quotation marks omitted).

A federal court will not review questions of federal law decided by a state court if the decision also rests on a state law ground that is independent of the federal question and adequate to support the judgment. *See Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991). In cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred. *See id.* at 750.

The rule cited here by the court of appeal, specifically, that a defendant must make a contemporaneous objection at trial in order to preserve an issue on appeal, has been found to be a sufficiently independent and adequate procedural rule to support the denial of a federal petition on grounds of procedural default. *See Paulino v. Castro*, 371 F.3d 1083, 1092-93 (9th Cir. 2004) (finding claim procedurally defaulted based on California's contemporaneous objection rules). The claim is therefore procedurally defaulted.

Although the court of appeal found that the prosecutorial misconduct claim was procedurally waived, it also found that the claim failed on the merits. Based on a review of the record, and applying the legal principles on prosecutorial misconduct as outlined above to this claim, the Court finds that the state court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent and was not based on an unreasonable determination of the facts in light of the entire trial record.

Finally, even assuming error, the evidence of petitioner's guilt was so strong that any due process violation did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637. As discussed above, petitioner's self-defense claim was weak and was contradicted by the physical evidence and the testimony of percipient witnesses.

Accordingly, petitioner is not entitled to habeas relief on this claim.

**3. Cumulative Error**

Petitioner claims cumulative error from the above purported trial errors. Petition at 5.

In some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may still prejudice a defendant so much that his conviction must be overturned. *Alcala v. Woodford*, 334 F.3d 862, 893-95 (9th Cir. 2003). Where there is no single constitutional error existing, nothing can accumulate to the level of a constitutional violation. *Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011); *Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002). Here, no single constitutional error has been found.

Accordingly, petitioner is not entitled to habeas relief on this claim.

**C. Certificate of Appealability**

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability. *See* Rules Governing § 2254 Case, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard. *Id.* § 2253(c)(3). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Here, petitioner has not made such a showing, and, accordingly, a certificate of appealability will be denied.

## IV. CONCLUSION

For the reasons stated above, the petition for a writ of habeas corpus is DENIED, and a certificate of appealability is DENIED.

The Clerk shall enter judgment in favor of respondent and close the file.

Additionally, the Clerk is directed to substitute Suzanne M. Peery on the docket as the respondent in this action.

**IT IS SO ORDERED.**

Dated: 11/30/2016

HAYWOOD S. GILLIAM, JR.
United States District Judge